## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

COMPUTEREASE SOFTWARE, INC.    :        Civil No. 1:06-cv-247

          Plaintiffs,         :

vs.                  :    **MEMORANDUM IN SUPPORT**
                     :    **OF PLAINTIFF'S MOTION FOR**
HEMISPHERE CORPORATION, et al.   :    **SUMMARY JUDGMENT ON**
                     :    **THE COUNTERCLAIM OF**
          Defendants.       :    **HEMISPHERE MANAGEMENT,**
                              **LLC**

       Comes now the Plaintiff, ComputerEase Software, Inc., and submits the following memorandum in support of its motion for summary judgment on the counterclaim of Hemisphere Management, LLC relating to the parties' Distribution Agreement of February 10, 1997. A copy of the Agreement is Exhibit J to the Robert D. Mattlin affidavit filed concurrently herewith. References to this affidavit are noted as (Mattlin ¶ ___).

### I. INTRODUCTION

       Plaintiff, ComputerEase Software, Inc. (*"CSI"*), is a manufacturer of accounting software used in the construction industry. CSI was founded in 1984 by its owner, Robert D. Mattlin. There are two Defendants in this declaratory judgment action, Hemisphere Corporation, Inc. (*"HCI"*) and Hemisphere Management, LLC, the subject of CSI's current motion for partial summary judgment. Scott Lyon of Salt Lake City, Utah owns both of these entities.

       HCI was an independent software dealer, selling CSI's software product under a Dealer Agreement between HCI and CSI. HCI began selling CSI software in 1995 in a

dealership territory which encompassed the states of Idaho, Utah, New Mexico, Arizona, Montana, Colorado, Nevada and Wyoming. HCI filed a counterclaim as part of its response to the original complaint. (Doc. 9) The upshot of HCI's counterclaim is that CSI wrongfully terminated the Dealer Agreement resulting in a forced sale of its customer base. CSI has previously filed a motion for partial summary judgment on HCI's counterclaim, based upon the parties' Limited Settlement Agreement and the Order of August 4, 2006, partially dismissing this claim. (Docs. 19 and 31)

The other Defendant in this case, Hemisphere Management, LLC (*"**HML**"*), was a "dealer manager" for CSI, also known as a Master Distributor (*"**MD**"*). (Mattlin ¶5) Its Distribution Agreement with CSI was executed in 1997, two years after HCI took on the role of CSI dealer. (Exhibit J to the Mattlin affidavit) HML's distributorship territory encompassed all states west of the Mississippi River other than those eight western states in HCI's dealership territory. The present summary judgment motion counters HML's claim that it is entitled to the value of its alleged investment and lost future earnings because, as MD in the west, HML purportedly was in a joint venture with CSI and that CSI could not unilaterally terminate this supposed joint venture. *See* paragraphs 25 and 26 of HML's counterclaim. (Doc. 43, p. 9)

To the contrary, the MD contract had no definite term, it was terminable at will by either party without any showing of good cause for the termination, ***and it was a services only contract that did not require that HML make any monetary investment***. It is black letter law that a services contract, where the contract does not require any consideration other than the party's services, is terminable at will. As the Restatement (Second) of Agency §442 provides: ". . . promises to employ and to serve at the agreed rate only so long as either party wishes" . . . are terminable at will . . . "if no

- 2 -

time is specified and no consideration for entering into the relation is given other than the promise in general terms to employ or to serve. . . ." As established agency law, this same principle governing purely services agreements was previously found in the Restatement (First) of Agency §442 (1938).

Indeed, it is indisputable that HML did not "buy into" its distributorship territory, did not have to "pre-pay" for the end-users' software licenses, or make any monetary investment of any kind whatsoever. It is also indisputable that HML was paid commissions for its MD services (approximately a third of revenues generated by the CSI dealers in HML's distributorship territory) totaling $2 million from 1997 through 2005. *See* Exhibit L to the Mattlin affidavit providing the yearly amounts of HML's commissions.

Regarding HML's joint venture claim, in its discovery responses HML modified this claim, asserting that it was more accurately a *de facto* partnership claim. Thus its discovery response proclaimed: "Under the prevailing law in Ohio, the joint enterprise between Hemisphere and CE (CSI) is more properly characterized as a *de facto* partnership than a joint venture."[1]

As will be seen, there was no *de facto* partnership between HML and CSI because HML received commissions rather than a share of profits. (Mattlin ¶37) Nor did the MD contract provide HML with any rights of "control, management or ownership" in CSI. (Mattlin ¶¶46-58) *See* below the discussion of <u>Simpson v. Ernst & Young</u>, 100 F.3d 436 (6th Cir. 1996)(holding ***as a matter of law*** that a CPA, lacking the necessary control, management or ownership of the business, was merely an employee of the accounting

---

[1] As stated, paragraphs 25 and 26 of the HML counterclaim alleged a joint venture with CSI. This memorandum will show that as a matter of law there was neither a *de facto* partnership nor a joint venture between HML and CSI.

firm even though he had the title of partner).

And because HML had no right of control over CSI, there can be no joint venture under Ohio law. *See* Citizens Word v. Canfield Township, 787 N.E.2d 104, 109 (Ohio App. 2003)(a joint venture requires authority to "direct and control the other with respect to all aspects of the alleged enterprise")(holding *as a matter of law* that plaintiff was not in a joint venture with defendant). Without a share of profits or control, HML was not CSI's partner meriting a share of a dissolved partnership's value.

In sum, CSI is entitled to summary judgment on HML's counterclaim on the following grounds: (1) the MD agreement was terminable at will; (2) HML did not provide any consideration for the MD contract other than its services; (3) it was paid in full for its performance as the west MD from 1997 through 2005; and (4) HML was not CSI's *de facto* partner or a joint-venturer with CSI. The facts related to these issues are undisputed and not subject to serious debate.

## II. BACKGROUND FACTS

### A. Supporting Affidavit of Robert D. Mattlin

CSI's founder and owner has submitted an affidavit and exhibits which set out all of the essential facts for evaluating HML's joint venture/*de facto* partnership claim, as well as the nature of the MD contract, including any modifications to the contract, as a purely terminable at will services contract. The affidavit discusses the formation of the east and west MDs in 1997 (¶¶1-11), the significant terms of the MD contract (¶¶12-15), and any modifications to the MD commissions and duties (¶¶16-24). It also explains how the MD payments were derived and calculated (¶¶25-29) and the circumstances surrounding the termination of the MD contract as of December 31, 2005 (¶¶30-33).

-4-

The Mattlin affidavit also directly addresses four issues: (1) why HML was not CSI's partner (¶¶35-39); (2) why there was no joint venture between HML and CSI (¶¶40-59); (3) the importance of product development to CSI's business with which HML had no right or management or control (¶¶60-63); and (4) how stopping MD commission payments at the end of 2005 did not cause HML any loss under its services only MD contract (¶¶64-71).

This last point is central to the basis for the present motion for summary judgment -- with the discontinuance of the west MD, there were simply no more MD services and no more MD commissions -- HML received $2 million for the services it performed over nine years and thereafter performed no more services and is entitled to no more commissions. This is the sum and substance of the present motion.

On February 10, 1997, CSI contracted with Hemisphere to be its Master Distributor in the western United States.[2] (¶12) At that time, CSI also set up an east MD with Brad Mercer, another CSI dealer, as the east MD. (¶5) HML's west MD territory excluded the eight western states that were in HCI's dealership territory. (¶8) Its MD duties consisted of providing technical support to CSI's dealers in the west, assisting in developing sales materials for all dealers, and growing unit sales through new and existing dealers in its MD territory. (¶6) *See also* paragraph 15 of the HML counterclaim, in which HML provided a general description of its MD activities. (Doc. 43, pp. 6-7)

The MD agreement did not require HML to make any monetary investment or meet any specific performance standards. (¶15) And the MD agreement stated that the

---

[2] For purposes of the MD contract, Hemisphere Management, LLC is the successor to Hemisphere Corporation. *See* paragraphs 7, 12, and 13 of the HML counterclaim. (Doc. 43, pp. 5-6)

MD was a "new venture" which neither HML nor CSI knew how long would last. Id. The MD agreement was a commissions-for-services contract which required Hemisphere to act as a dealer-manager in return for commissions based on the revenues generated by the CSI dealers which HML was to manage. Id.

The MD agreement had no fixed term, but did provide HML with an exclusive distributorship territory. It nevertheless did not give HML an ownership interest in the end-users of CSI's accounting software in the MD distributorship territory. (¶14) By the terms of the CSI dealer agreement, those end-user customers were owned by the western CSI dealers themselves, not by their MD manager. Id. As a party to a services contract, the role of MD did not involve the acquisition of any assets. (¶15)

Between 1998 and 2004, there were several modifications to the MD agreement. (¶¶16-24) In 1998, CSI and HML agreed to adjust HML's MD territory to include Wisconsin, while Missouri and four counties in Kansas were transferred to the east MD.[3] (¶16) Additionally, CSI agreed at that time, in exchange for Scott Lyon relinquishing the favorable dealer pricing concession set out toward the end of the original MD contract, to pay HML both MD and dealership commissions for sales HCI made in two of its dealership states, Arizona and New Mexico. (¶17) Six years later there was another modification to the MD contract. Thus in September 2004, CSI took over all technical support of the dealers in HML's distributorship territory. (¶22) This change resulted in a reduction in HML's commissions, to the extent of $2,500 per month. (¶22) Similarly, in 2001, there had been a reduction in HML's commissions

---

[3] The east MD was terminated in 2000 when Brad Mercer refused to discontinue developing a potentially competing product. (¶ 7)

when the CSI dealers set up a Joint Marketing Fund. (¶20) The monetary impact of the 2001 and 2004 MD commission changes are shown on Exhibit L to the Mattlin affidavit.

The Mattlin affidavit also explains the circumstances surrounding the termination of the west MD as of December 31, 2005. (¶¶30-34) By the end of 2005, CSI had no reason to continue the west MD. By then, most of the MD duties established by CSI in 1997 were being performed by CSI itself or by the dealer channel, either directly by the dealers themselves or through the dealers' Joint Marketing Fund. (¶34) The most important MD duty for which HML was responsible, namely growing unit sales in the west, was simply not being performed at all. (Exhibits B through I of the Mattlin affidavit) Thus in 2004, CSI had completely taken over HML's technical support obligation; hired a national marketing director at the end of 2005; and sales in HML's territory had remained stagnant for six years, with the addition of no new successful CSI dealerships in the west.[4] (¶28) As a result, in September 2005, CSI put HML on notice that the continued existence of the MD was in serious jeopardy. On February 1, 2006, after several months of discussions, Scott Lyon rejected CSI's offer to terminate the west MD amicably without the threat of litigation. (¶70)

**B.**  **HML's Discovery Responses**

CSI is filing HML's Answers to Interrogatories and Responses to Requests for Admission into the record in support of its motion for summary judgment. The most pertinent Answers and Responses to the present motion are discussed herein.

HML claims that the contract was not a commissions for services contract, but

---

[4] By 2005, the three former Maxwell Business Systems dealers which Mattlin obtained as CSI dealers in the west accounted for nearly 90% of the west dealers' revenue. Since these experienced dealers did not need more than minimal MD support, it made no business sense for CSI to continue paying HML $350,000 annually to oversee dealers generating 10% of the revenues in its distributorship territory. (¶33)

actually constituted a joint venture or *de facto* partnership. The nature of HML's claim

is most evident in its responses to CSI's Requests for Admission. HML refused to admit

the obvious, namely that it received commissions as MD. Instead, to manufacture its *de*

*facto* partnership claim, HML claims that it received a share of CSI's profits:

> **REQUEST NO. 2:** Please admit that during the years 1997 through 2005, CSI never paid HML any distribution of profits from the joint venture alleged in paragraph 25 of the Counterclaim.

> **RESPONSE:** Denied. Under the prevailing law in Ohio, the joint enterprise between Hemisphere and CE is more properly characterized as a de facto partnership than a joint venture. Hemisphere's portion of revenues generated by non-Hemisphere Dealers in the western United States were tied to the ebb and flow of this enterprise, not to the time and effort of Hemisphere itself. As such, to the extent those payments constitute more than simply contract commissions, they are profits from a common enterprise.

Indeed, it is the nature of commissions that they "ebb and flow" with revenues

generated and not necessarily with "profits." The above response to Request No. 2 is

simply a bad faith maneuver to avoid admitting a fatal defect in HML's *de facto*

partnership claim. The same is true of the following response.

> **REQUEST NO. 3:** Please admit that from 1997 through 2005, CSI never paid HML any dividends or distribution of profits under the MD Agreement.

> **RESPONSE:** Denied. Because, as described in response to Request No. 2, above, Hemisphere's receipts as a Distributor were tied to the overall revenues and profitability of the common enterprise, to the extent they constitute more than simply contract commissions, they are distributions of dividends or sharing of profits.

For a complete itemization of CSI's MD payments to HML from 1997 through

2005, ***and the gross revenues on which these payments were based***, *see*

Exhibit L to the Mattlin affidavit.

Instead of simply admitting that it did not share in CSI's operational expenses

- 8 -

related to CSI's west dealers, HML stated:

> CE (CSI) expected and fully accepted Hemisphere's participation in dealer support and training, as well as activity such as development of marketing materials and management of website development. All of these activities benefited the entire CE (CSI) dealer network, including dealers in the east part of the United States from whose revenue Hemisphere received no payments. ***Hemisphere's internal costs*** for these activities were a direct sharing of common enterprise operating expenses.

Response to Request No. 4 (emphasis added). As will be seen, this answer fully supports the present summary judgment motion, since it confirms that ***HML only provided services*** to CSI and therefore the contract was terminable at will. HML's ***internal costs*** of providing the services do not change this result.

In addition, all of the CSI dealers provided such services, to the benefit of the entire dealer channel, but they did so without any compensation. (Mattlin ¶49) HML begrudgingly admitted as much:

> **REQUEST NO. 61:** Please admit that for the years 2000 through 2005 each of the CSI dealers contributed ideas, strategies and time to CSI's National Marketing initiatives.
>
> **RESPONSE:** Admitted that most dealers contributed at least some ideas, some time, and/or some dollars to National Marketing initiatives. However, the amount of contribution varied significantly from Dealer to Dealer, and no Dealers approached the level of comprehensive involvement, detailed follow through and final responsibility which Hemisphere exercised as distributor, to the benefit of the entire Dealer network.

This self-serving exaggeration of HML's contributions has no legal significance. No matter how much effort HML put into these services, the contract was still terminable at will. Nor does the amount of such services make HML a partner or joint-venturer. That the other CSI dealers were not compensated for such similar efforts makes no impression on HML:

**REQUEST NO. 81:** Please admit that most, if not all, of the CSI dealers contribute to CSI's marketing strategies and efforts without any additional compensation.

**RESPONSE:** Denied. If the intended implication of Request No. 81 is that Hemisphere's participation in marketing was simply equivalent to some average dealer participation.

Of course, the Request did not ask whether HML's contribution was or was not "equivalent to some average dealer participation." The other dealers were not compensated for the same types of activities which HML claims made it a partner or joint-venturer with CSI. ***The significant point on this motion is that HML's activities and the activities of the other dealers, both of which benefited the dealer channel as a whole, were of the very same nature and the nature of these activities were neither of partnership nor joint venture quality***. If these activities did establish partner status, all the CSI dealers who contributed to the operation and success of the dealership channel as a whole would be CSI's partners.

HML's Response to Request No. 5 makes it even more clear that the MD contract was a ***terminable at will services only*** contract:

**REQUEST NO. 5:** Please admit that HML invoiced CSI for any expenses which HML incurred under the MD Agreement.

**RESPONSE:** Denied. While it is true that CE (CSI) did reimburse Hemisphere for some outside vendor costs and expenses, Hemisphere extended substantial unreimbursed effort in the common enterprise, such as developing marketing ideas and materials, coordinating and conducting dealer support and training, operating Yahoo OneList networks, coordinating and upgrading the CE (CSI) website, developing and distributing demo disks, etc.

Although this deceptive answer (the Request did not ask anything about "unreimbursed effort") is a denial, the response nevertheless confirms that this case involves services

- 10 -

performed by HML pursuant to a terminable at will contract and not a monetary investment.[5]

In a backhanded way, HML also admitted that the MD contract had no fixed term because the MD concept was experimental:

> **REQUEST NO.10:** Please admit that HML and CSI had no intent to form a joint venture relationship when entering into the MD Agreement.
>
> **RESPONSE:** Denied. With the clarification that the common enterprise is more properly characterized under Ohio law as a *de facto* partnership, CE (CSI) and Hemisphere stated unequivocally and early on that 'it is understood that this is a new venture with both parties and the outcome of setting up dealers is unknown.'

Of course, calling the undertaking a "new venture" in the MD contract does not transform this new venture into a joint venture or partnership. *See* the case law discussion below. But it does explain why the contract does not have a fixed term and why its terms are for the most part so nebulous.

It is clear that HML's joint venture/*de facto* partnership claim is based on "unreimbursed effort" (i.e., services) and not monetary investment:

> **REQUEST NO. 5:** Please admit that HML invoiced CSI for any expenses which HML incurred under the MD Agreement.
>
> **RESPONSE:** Denied. While it is true that CE did reimburse Hemisphere for some outside vendor costs and expenses, Hemisphere extended substantial unreimbursed effort in the common enterprise, such as developing marketing ideas and materials, coordinating and conducting dealer support and training, operating Yahoo OneList networks, coordinating and upgrading the CE website, developing and distributing demo disks, etc.

This, of course, is ludicrous. Unreimbursed effort is a service and not an investment.

---

[5] Even if HML had made a monetary investment, the contract still would not be for a definite duration but only for a reasonable duration. Nine years is well beyond a reasonable duration since HML did not "purchase" its distributorship territory nor did it have any other investment which it did not recoup by December 31, 2005. *See* the legal issue discussion below.

Also, even if HML did "extend effort" in performing such services as MD, the services were not "unreimbursed."[6] HML received approximately $2 million in commissions for performing such services.

HML takes most credit for its role in developing CSI's 2003 website. *See* the response to Request No. 64. Yet HML had to admit that it was reimbursed for any expenses related to this effort (Nos. 65 and 83). And HML also admitted that another CSI dealer, Carl Mitchell, played a similar role in producing marketing materials (demo CD and sales brochure), and that it was Mitchell who in fact originated and for two years ran the dealers' Joint Marketing Fund (Request Nos. 71-73).

For all of the emphasis which HML places on its "unreimbursed efforts" as MD, its Answers to Interrogatories make clear that HML has no record of time spent on MD duties:

> **INTERROGATORY NO. 2:** For each of the years 2000 through 2005, please state the average number of hours per week HML devoted to its master distributorship duties under the MD Agreement and the full name(s) of the person(s) performing these duties in each of these years.
>
> **ANSWER:** Hemisphere did not track its distributorship activities by hour and by employee.

Similarly, it went on to state:

> Hemisphere's many other areas of distributorship activity, including development of publications, marketing materials, website, nationwide training, encouragement of direct mail, implementation of telemarketing, etc. are not logged or tracked specially.

Not only does HML have no idea of time spent on MD duties, not even an average number of hours per week, it has no record either of MD expenses:

---

[6] The MD contract required HML to perform such services. It provided that the MD would "help with the development of a dealer contract and dealer sales materials." *See* Exhibit J to the Mattlin affidavit.

**INTERROGATORY NO.5**: For each of the years 1997-2005, please itemize each and every monetary amount, if any, which HML expended in the performance of its obligations under the MD Agreement.

**ANSWER**: . . . the operations of the Hemisphere dealership and the distributorship were largely integrated, with employees providing dealership or distributorship effort interchangeably and as needed over time . . . the general operating expenses of Hemisphere cannot be segregated between distributorship and dealership, except by a general apportionment, to the relative amount of revenues earned in those two spheres of activity over time. The general operating expenses have been fully documented through documentary support of the Brad Townsend expert opinion.

In short, HML cannot say what its MD expenses were because it did not operate the MD as a separate business.[7] Its expenses were intermingled with the expenses of the HCI dealership. Likewise, HCI dealership employees performed the MD duties of HML. (HML Responses to Requests for Admission Nos. 53 - 55)

HML's above answer does also state that it did keep track of its expenses related to marketing activities. It kept a record because it sought and received reimbursement of all of these expenses from either CSI or the dealers' Joint Marketing Fund. (HML Responses to Requests for Admission Nos. 5, 65 and 83)

Finally, HML admits that, even though its joint venture/*de facto* partnership claim is based upon its alleged sharing of "profits" with CSI, it has no idea what the amount of those profits are:

**INTERROGATORY NO. 9**: Do you contend, in support of the joint venture allegation in Paragraph 25 of the Counterclaim, that HML received a share of the joint venturer's profits at any time during the years 1997-2005?

---

[7] The Townsend report, consistent with HML's discovery responses, did not segregate HCI's and HML's "general operating expenses." From that report, there is absolutely no way to determine HML's internal costs for providing its MD services. Therefore, even if it had a claim for loss of MD profits, it could not prove the actual amount of the losses since it has no idea of its MD expenses. Townsend did not even address the issues of MD net revenues or projected MD losses, since there is no record of MD expenses.

- 13 -

**ANSWER**: Yes.

**INTERROGATORY NO. 11**: If your answer to Interrogatory No. 9 above is in the affirmative, please state for each of the years 1997-2005 the amount of profits earned by the alleged joint venture and the formula by which HML's share of profits was calculated.

**ANSWER**: Objection. CE (CSI) has better and more economical access to this information, and therefore the interrogatory is unduly burdensome. CE (CSI) has full access to the commission revenues from dealers.

This ridiculous answer illustrates just how legally meaningless HML's joint venture/*de facto* partnership claim actually is. The requested "formula" is simple. It was set out in the MD contract as a third of west dealer revenues. What HML is trying to avoid is acknowledging the obvious, its share of west dealer revenues was not profits at all, but MD commissions. *See* the year by year itemization of west dealer revenues and west MD commissions in Exhibit L to the Mattlin affidavit. If HML admitted how its commissions were calculated, it would be admitting that it did not receive a share of CSI profits, the death knell to its partnership and joint venture claims.

## III.    LEGAL ISSUES

### A.    Summary Judgment Standard

This Court set out the governing rules for granting summary judgment on a claim for relief in <u>Upshaw v. Ford Motor Company</u>, 2007 WL 1875844 (S.D. Ohio 2007). The key principles for the present motion are that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, and that the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. <u>Id</u>. at *5.

**B.    Terminable At Will Contract**

As stated, the MD contract at issue had no fixed term, no notice of cancellation provision and no termination for "good cause only" provision. (Mattlin ¶13)  And, in these circumstances and because HML provided services only, it was terminable at will by CSI or by HML at any time without any financial loss or claim of financial loss by either party.  As a non-investing service provider, HML role as MD more accurately is governed by the same legal principles that govern employment at will contracts.

Although the MD contract is titled a "Distribution Agreement" and the west MD territory is referred to as an exclusive distributorship territory, the MD in the CSI dealer channel has none of the attributes of a true distributor.  The MD contract is not an actual distribution contract:

> The agent or buyer in exclusive sales agency or distribution contracts is usually doing more than merely offering to render services or to pay the price for the goods.  It is at least expected and understood, and, in fact, frequently expressly provided in the contract, that the agent is to make a substantial investment and to build up or maintain a business establishment for the distribution of the manufacturer's products.

19 Williston on Contracts §54:52 (4th ed.)  It is undisputed that HML neither made a substantial investment nor distributed CSI's software product.  Yet, even if it were a true distribution contract (which it absolutely was not), the MD contract would nevertheless still not be for a definite term, but only for a reasonable term.  In that event, it cannot be disputed that nine years is a reasonable time in the light of factors identified in distribution contract case law.

**1.    Services Only Contracts**

In its discovery responses, HML insists that it was CSI's *de facto* partner or was engaged in a joint venture with CSI because, over the years from 1997 through 2005, it

- 15 -

performed such a wide-ranging scope of activities which benefited not only the west dealers in its MD territory, but the dealers nationally.[8] HML points to its assisting with the development of the 2003 CSI website, setting up instructional "webinars," participating in trade shows, setting up an on-line chatroom for dealers and conducting a training session on telemarketing. (HML Responses to Requests for Admission Nos. 5, 15, 22, 52, and 58)

Whether or not these activities indicate a partnership or joint venture relationship (which they absolutely do not) is discussed below. What these activities do indicate is that ***HML was providing its services***. And, in a case where the complaining party has provided no more than its services, its contract with the other party is terminable at will. The Restatement (Second) of Agency §442 states this black letter rule as follows:

> ***Promises by a principal to employ and by an agent to serve are interpreted as promises to employ*** and to serve at the agreed rate ***only so long as either party wishes, if no time is specified and no consideration for entering into the relation is given other than the promise in general terms to employ or to serve,*** in the absence of manifestations indicating otherwise.

*(Emphasis added.)*

*See also* 19 Williston on Contracts §54:54 (4th ed.)(". . . if an agent or employee furnishes a consideration ***in addition to his or her mere services,*** he or she is deemed to have purchase the employment for at least a reasonable period where the duration of the employment is not otherwise defined."); and 17B C.J.S. Contracts §441 ("The rule that contracts without an express termination date will be found to imply that

---

[8] As explained in the Mattlin affidavit, all of the CSI dealers made similar contributions since they were mutually beneficial to the dealer channel as a whole. Even if Scott Lyon provided more of such services, he was compensated with $2 million in MD commissions. The other dealers' contributions were voluntary. (Mattlin ¶¶49-50)

performance is intended to continue for a reasonable period of time and will only be terminated upon reasonable notice ***should not be applied*** to contracts of employment or exclusive agency, distributorship, or requirements contracts which have been analogized to employment contracts.").

These principles are of course most applicable to and are most often applied in employment contract cases. But as indicated in the C.J.S. article on contracts, Restatement (Second) of Agency case law and in Williston, all cited above, they are not limited to employment contracts.

Thus in <u>Matter of Pennsylvania Tire Co.</u>, 26 B.R. 663 (Bkrtcy. Ohio 1982), the court found ***as a matter of law*** that a tire distributorship contract was in fact merely a contract for services that could be terminated at will without prior notice:

> Where one grants authority to another to act as his agent for him, the authority so granted may be revoked at any time.

<u>Id</u>. at 670, relying upon <u>Burger Brewing Company v. Summer</u>, 261 F.2d 261 (4th Cir. 1958). <u>Burger</u> adopted the general agency principle that a contract of no fixed duration may be ended at any time without notice unless the agent has provided substantial consideration beyond his services. <u>Id</u>. at 262. The <u>Pennsylvania Tire</u> opinion, *supra*, also observed that:

> The exception for agents which have invested considerable consideration in the relationship, alluded to in the <u>Burger</u> opinion, appears also to exist under Ohio law.

26 B.R. 663 at 671. The court found that the tire distributor's "contribution was essentially limited to selling tires, something he would have done whether as an order-by-order customer or as a distributor." <u>Id</u>. at 671.

- 17 -

Similarly, in the case at hand, HML provided no consideration beyond the services it provided, which were no different than those it could have provided as an employee of CSI. HML bought no inventory, secured no contracts, and established no distribution network. By 2005, having relinquished its dealer technical support obligation, it merely supervised the west dealer channel, made contributions to national marketing efforts and, by its account, assisted in dealer training and information sharing. Like any service provider, HML could be terminated at any time without cause and without notice. Why? Because a service provider loses nothing other than its compensation – for which it is no longer providing services.

## 2. **Employment Contracts**

As stated, the most commonly litigated terminable at will services contracts are employment contracts. As a result, the agency principles applicable to services contracts are found in employee case law. In numerous employment cases, the Ohio courts have recognized the above terminable at will legal principles.

Under Ohio law, employment contracts that do not have a fixed term are considered to be terminable at will. *See* Sowards v. Norbar, Inc., 605 N.E.2d 468, 471 (Ohio App. 1992)("As a general rule, an employment relationship with no fixed duration is deemed at will, meaning the employee is free to seek work elsewhere and the employer may, at any time, terminate the employment relationship for any reason not contrary to law."); *See also* McCary v. Akron Turners Club, Inc., 2007 WL 1345747, *2 (Ohio App. 2007)("An at-will employee may be discharged at any time and for any reason, with only three exceptions: violation of public policy, violation of express contractual provisions, or representations made to an employee that fall within the

doctrine of promissory estoppel."). In <u>McCary</u>, the Court of Appeals **affirmed summary judgment** for the defendant employer on the terminable at will issue.

Likewise, in a case involving an independent sales representative, the Ohio Court of Appeals stated the rule as follows: ". . . Ohio law holds that employment contracts of indefinite duration between a principal and an agent are terminable at will." <u>Plastics for Industry, Inc. v. Greif Bros. Corp.</u>, 1995 WL 557274, *3 (Ohio App. 1995), *citing* <u>Miller v. Wikel Manufacturing Co., Inc.</u>, 545 N.E.2d 76, 78 (Ohio 1989).

Although the MD contract between CSI and HML did not create an employment relationship, the agency principles governing employment contracts and purely services contracts are the same, as indicated by the <u>Plastics for Industry</u> case cited above. If no term is stated, these contracts are terminable at will without notice. *See also* 17B C.J.S. Contracts §441, cited and quoted above.

### 3.   **Distributor Contracts**

As stated, HML did not invest in the west MD distributorship nor did it act in a mid-tier sales capacity between CSI and CSI dealers. Thus it was not a true distributor, but rather a party to a services agreement. *See* 19 Williston on Contracts §54:52 (4th ed.) cited and quoted above.

Nevertheless, distribution agreements are terminable at will after a reasonable duration, such as a sufficient length of time for the distributor to recover its investment. The recoupment principle was succinctly stated in <u>Cambee's Furniture, Inc. v. Doughboy Recreational, Inc.</u>, 825 F.2d 167 (8th Cir. 1987), where the distributor was required to make annual investments in the distributorship:

> Thus, we hold that a distributor is entitled to a reasonable period to recoup its investment, during which the agreement may not be terminated without good cause. After the reasonable recoupment period

- 19 -

> has expired, the distributorship agreement becomes terminable at will
> upon reasonable notice.

Id. at 173 (case citations omitted). Of course, HML was not required to make any such annual investment, or any financial investment, in its MD distributorship.

The Ohio Supreme Court stated the rule governing true distributorships as follows:

> We agree that a distributorship is generally terminable at will by either
> party after a reasonable duration and on reasonable notice.

Miller v. Wikel Manufacturing Co., Inc., 545 N.E.2d 76, 78 (Ohio 1989). Although there was a dispute over the terms and duration of the oral contract in that case, the Court held that the manufacturer had failed to preserve for appellate review the terminable at will issue. Id. at 79. In the case at hand, HML was not a product distributor as was the complaining party in Miller and there can be no dispute that the MD contract did not contain a fixed duration.

In Excello Wine Co. v. Monsieur Henri Wines, Ltd., 474 F.Supp. 203 (S.D. Ohio 1979)(applying Ohio law), plaintiff Excello was a true distributor, selling eighteen of the top thirty selling wines in Ohio, including the two top sellers of the defendant's wines, to wine retailers. The U.S. District Court found, *as a matter of law*, that a 25-year distribution relationship, where the parties' oral agreement did not include a fixed term, was terminable at will after a reasonable period. Id. at 208. The opinion further noted: "The reasonable period of existence permits the distributor to recover the additional fixed costs (e.g., capital expenditures) which have been incurred in reliance upon the distributorship agreement." Id. at 208. *See also* Matter of Pennsylvania Tire Co., 26 B.R. 663 (Bkrtcy. Ohio 1982).

In the case at hand, ***HML made no such expenditures***. Moreover, as it acknowledged in its discovery responses, it has no record of any MD expenses which were not already reimbursed by CSI or the CSI dealers' JMF. As a result, the parties' nine-year relationship far exceeds a reasonable duration as a matter of law. *See* Wagner v. Menke, 20 Ohio Law Abs. 501 (Ohio App. 1935)(". . .reasonableness can be decided as a matter of law where the facts are undisputed as to the question of duration."). Of course, as stated, HML under its MD contract with CSI is not truly a distributor, but is akin to an at-will employee providing its services only. Therefore, the "reasonable duration" rule has no applicability to the case at hand.

As with true distributorships, the reasonable notice principle applies to franchise contracts. In Consun Food Industries, Inc. v. Fowkes, 81 Ohio App.3d 63 (Ohio App. 1991), the court stated the rule as follows:

> Where parties to a contract express no period for its duration, and none can be implied from the nature of the contract or from the circumstances surrounding them, the only reasonable intention that can be imputed to the parties is that the contract may be terminated by either party upon the giving of reasonable notice of his intention to the other party.

Id. at 68, *citing* Richter v. First Natl. Bank of Cincinnati, 80 N.E.2d 243, 245 (1947).

Although the west MD was not a true distributorship nor a franchise, HML did have notice that the MD was being terminated as of December 31, 2005. (Mattlin ¶¶ 69-71) The parties' negotiations for an amicable termination without litigation occurred from December 2005 to April 2006. But Scott Lyon made it clear as early as February 1, 2006, that he would not agree to an amicable resolution unless he was paid what he considered to be full value for the MD, a concept with which CSI disagreed then and, for all the reasons stated herein, still disagrees.

## C.     Joint Venture Analysis

A joint venture under Ohio law is a contractual relationship, either express or implicit, between two or more parties to carry on a single business enterprise for joint profit. Citizens Word v. Canfield Township, 787 N.E.2d 104, 109 (Ohio App. 2003).  In reviewing the relationship between a township and a developer concerning the construction of water lines this opinion stated:

> A joint business venture requires that each party has the authority to equally direct and control the other with respect to all aspects of the alleged enterprise.

Id. at 109.  In the case at hand, there was absolutely no express or implicit agreement between CSI and HML to share profits.  Nor did HML in any way direct or control the actions or operations of CSI in any aspect of the alleged enterprise.

In order to establish the existence of a joint venture, the burden of proof is upon the party who asserts the relationship existed.  In re:  Matter of Dayton Circuit Courts No. 2, 80 B.R. 434, 431 (S.D. Ohio 1987).  That court, applying Ohio law, stated:

> Where the existence of a joint venture is controverted, the relationship may be found in the mutual acts and conduct of the parties.

Id. at 431.  In reviewing the relationship between two racquetball clubs which allowed their respective members access to either club and conducted joint marketing initiatives the court held:

> The parties may have been carrying out various marketing, advertising and promotional ideas in an attempt to reduce expenses and thereby increase profit; ***however, the parties were not carrying out a single business enterprise***, i.e., the operation of a single racquetball facility with two separate locations, for profit.

Id. at 438.  Likewise, in the case at hand, HML supervised dealers and contributed to national marketing (and possibly some national dealer training), but they did not "join forces" to generate and share profits.

## D. De Facto Partnership Claim

In Rivercrest Farm, Inc. v. Taber, 1998 WL 305362 (Ohio App. 1998) the court, when attempting to determine the existence of a *de facto* partnership, consulted the partnership provisions of the Ohio Revised Code and stated:

> R.C. 1775.05(A) defines a partnership in fact as "an association of two or more persons to carry on as co-owners a business for profit ..."

Id. at *2.  Thus the two essential elements are co-ownership of a business and sharing of profits.  *See also* In re Estate of Nuss, 646 N.E.2d 504 (Ohio App. 1994), where the Court of Appeals reversed the probate court's finding that a mother and son operated a farm as partners because there was no sharing of net profits.  "Importantly, there is also no indication that the parties shared net profits." Id. at 508.  In the case at hand, of course, CSI and HML were no co-owners, nor did they share net profits.

In Simpson v. Ernst & Young, 100 F.3d 436 (6th Cir. 1996), after reviewing Ohio case law, the Sixth Circuit decided the *de facto* partnership issue *as a matter of law, affirming summary judgment on this issue*. Id. at 439.  The Court held that plaintiff was an employee and not a partner:

> [W]e focus not on any label, but on the actual role played by the claimant in the operations of the involved entity and *the extent to which that role dealt with traditional concepts of management, control, and ownership.*

Id. at 443 (emphasis added).  The Sixth Circuit affirmed the trial court's holding that a CPA with a large accounting firm was in fact an employee even though he was called a partner by the accounting firm.

The Simpson opinion provided a laundry list of factors for courts to consider in deciding the *de facto* partnership issue: the right and duty to participate in management; the right and duty to act as an agent of other partners; exposure to liability; the fiduciary relationship among partners; use of the term "co-owners" to indicate each partner's "power of ultimate control;" participation in profits and losses; investment in the firm; partial ownership of firm assets; voting rights; the aggrieved individual's ability to control and operate the business; the extent to which the aggrieved individual's compensation was calculated as a percentage of the firm's profits; the extent of that individual's employment security; and other similar indicia of ownership. Id. at 443-44.

Applying the relevant factors in this laundry list to the case at hand, the following conclusions are indisputable: (1) neither CSI nor HML had the right or duty to participate in the management of each other's business; (2) HML did not have the right and duty to act as an agent of CSI; (3) it had no exposure to liability for CSI's debts or obligations of any kind; (4) there was no fiduciary relationship between HML and CSI; (5) CSI and Hemisphere never used the term "co-owners" and HML had no "power of ultimate control;" (6) HML did not participate in the profits and losses of CSI, it only received commissions; (7) HML did not make a financial investment in the west MD; (8) HML did not have ownership of any MD assets; (9) HML had no voting rights concerning any operations of CSI; (10) HML's compensation was not calculated as a percentage of profits, it only received a commission based on gross revenues from its territory; and (11) the MD contract could be terminated at any time providing no "security" of continuing duration.

In a recent Ohio case, the court used this same approach in determining whether an attorney was an employee of a law firm or a partner in the firm. In <u>Mellino v. Charles Kampinski Co., L.P.A.</u>, 837 N.E.2d 385 (Ohio App. 2005), plaintiff could have been considered an employee of the firm because (1) there was no partnership agreement, (2) he received a W-2, and (3) his cases were managed in part by the long-time owner of the firm, Charles Kampinski. On the other hand, Mellino's compensation was 17% of the firm's profits and he was responsible for 17% of the firm's expenses. Also, Kampinski was gone most of the time such that the "employee" (Mellino) signed contracts with firm clients and for the most part ran his own cases. Mellino was the firm's "trial guy." Kampinski did not manage or control Mellino's courtroom trial work. Was Mellino an employee of the firm or was he Kampinski's *de facto* partner? The court held that, because the facts could reasonably be construed as indicative of either partner or employee status, the jury had to decide if Mellino was just an employee or actually a partner of the law firm.

HML exercised no traditional forms of management, control or ownership. Nor did HML share in CSI's profits or expenses. Thus the facts herein relating to the partnership issue are one-sided, unlike the facts in <u>Mellino</u> where Mellino could reasonably have been considered either an employee or a partner. Also, the contract between CSI and Hemisphere was not a partnership contract, but rather a commissions for services agreement. As a matter of law, therefore, there was no *de facto* partnership between CSI and HML.

In <u>Coleman v. La Bounty Amusement Co.</u>, 153 N.E. 90 (Ohio App. 1925), the Court of Appeals affirmed the trial court's judgment that the parties were not partners in the operation of dance hall where the plaintiff provided the location and defendant

provided music and band. Most importantly for the case at hand, the parties' sharing of gross revenues from the dance hall operation did not make them partners:

> There was no sharing of profits and losses, the half of the gross receipts, being paid merely for the use of the pavilion, may be properly treated as rental. There was no community of interest either in the proceeds of the business, in the capital employed, in the power of administration, or in any other respect. The business was not carried on under a firm name, and there was no holding out to the public as partners.

In the case at hand, although the commissions paid to HML could not be considered rental payments as in Coleman, HML's commissions were "off the top" rather than a sharing of bottom line profits. Therefore, under this dated opinion rendered in 1925 and all Ohio case law decided since, HML's lack of sharing profits and the absence of any other indicia of co-ownership demonstrate that HML was no more than an independent contractor providing services for compensation. It was not CSI's partner.

## IV. **CONCLUSION**

When CSI discontinued the west MD as of December 31, 2005, HML sustained no loss. Although its commissions were discontinued, its services were no longer required. This is the practical reason for the termination at will doctrine as applied to services contracts. It is firmly established agency law recognized and applied throughout the country.

No matter how much effort HML expended in recruiting new dealers (very little), developing a replacement website for CSI, training dealers nationally (very little), developing sales materials, sharing strategies and ideas with all CSI dealers (very little), and supporting the west dealers, it made no financial investment that would render inapplicable the above terminable at will principles. The reason is evident. HML did not continue any of these efforts beyond 2005.

Nor was there any justifiable reason for CSI to continue paying commissions beyond 2005. CSI had gradually, prior to 2004, taken over technical support of the west dealers and then, in September 2004, assumed this obligation entirely. Toward the end of 2005, the CSI dealer channel had reached a consensus to take a new direction with its national marketing activities (for which the dealers were paying by their contributions to the JMF) by authorizing the hiring of a full-time national marketing director. By December, this person was up, running and reporting his marketing activities to the CSI dealer channel. Thirdly, the west dealers in HML's distributorship territory, at least the three that were generating 90% of the total revenues, did not need an MD. The MD experiment, begun in 1997, had run its course by the end of 2005.

As a matter of law, HML is not entitled to the value of continued MD commissions. Even its damages expert, Brad Townsend, did not (and could not) calculate such claimed damages. As HML acknowledged in its discovery responses, Townsend had no record of HML's expenses related to its MD duties because HML did not keep track of such expenses. Surely, HML is not entitled to the value of future commissions without deducting MD expenses. Townsend avoided this dilemma, as noted in HML's discovery responses, by combining Hemisphere's dealership and distributorship expenses, and applying these expenses to **combined** dealership and distributorship income. Townsend did no evaluation of strictly MD losses, a legally fatal deficiency for HML's counterclaim. In fact, there were no MD losses for the reason stated, the MD's services were discontinued at the same time as MD commissions.

For the foregoing reasons, CSI requests that the Court dismiss the HML counterclaim as a matter of law.

- 27 -

Respectfully submitted,

/s/ Richard G. Meyer
Richard G. Meyer
Angela M. Gates (#0077122)
Deters, Benzinger & LaVelle, P.S.C.
207 Thomas More Parkway
Crestview Hills, Kentucky 41017
(859) 341-1881
(859) 341-1469 fax
rmeyer@dbllaw.com
*Counsel for Plaintiff,*
*ComputerEase Software, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing was delivered via CM/ECF on the 10th day of September, 2007 to Russell Fericks at Russell-Fericks@rbmn.com and John C. Scott at jscott@faulkner-tepe.com.

/s/Richard G. Meyer
Richard G. Meyer