IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| COMPUTEREASE SOFTWARE, INC. : | Civil No. 1:06-cv-247 | |
| Plaintiff, : | | |
| vs. : | PLAINTIFF'S SUMMARY JUDGMENT REPLY MEMORANDUM REGARDING DEALER AGREEMENT | |
| HEMISPHERE CORPORATION, et al. : | | |
| Defendants. : | | |

Comes now the Plaintiff, ComputerEase Software, Inc. ("*CSI*"), by counsel, and submits the following partial summary judgment Reply Memorandum relating to the 2005 Dealer Agreement between CSI and Hemisphere Corporation, Inc. ("*HCI*").

INTRODUCTION

Unexpectedly, HCI's Response Memorandum has greatly simplified the summary judgment issues to be decided by this Court in regard to HCI's Dealer Agreement claims. Thus HCI has abandoned its claim that it did not receive fair market value in the sale of its Customer Base to Microvisions II. (HCI Response Memo., Doc. 150, pp. 15-16)  In fact, reading HCI's exact comments in this regard, one would conclude that HCI never made any such claim, now referring to it only as a mitigation of damages issue. (HCI Response Memo., pp. 15-16)  At any rate, the Court no longer has to decide the "forced sale" issue in addressing CSI's partial summary judgment motion on the Dealer Agreement.

Secondly, by way of introduction, the sole remaining focus therefore is on the legal implications of the decision by Scott Lyon, HCI's owner, to allow the 2005 Dealer

Agreement to expire, even beyond the 30-day grace period in the Agreement, without having a new contract in place. For the reasons stated herein, Lyon's decision is fatal to his Dealer Agreement damages claims. HCI's claimed damages flow directly from Lyon's voluntary decision to allow the 2005 contract to expire without the 2006 "fixed fee" contract in place. No one but Scott Lyon is responsible for this outcome.

SUMMARY JUDGMENT ISSUES

I.   IN ITS DISCOVERY RESPONSES HCI IDENTIFIED ITS EXCLUSIVE SALES TERRITORY CLAIM AS ONE OF ITS TWO SOURCES OF DAMAGES.

CSI provides its dealers with two means of protecting its income stream. Each dealer owns its Customer Base, which it therefore can sell upon termination of the dealership. In this regard, HCI has at last conceded that the market value for such sales is $3,000 per customer: "To the extent that Hemisphere will receive payments roughly equivalent to $3,000 per customer, apparently Plaintiff is in complete agreement that the duty to mitigate has been fully satisfied."[1] (HCI Response Memo., pp. 15-16) Secondly, *so long as they remain under contract*, CSI dealers have an exclusive sales territory. But in this case, Scott Lyon chose not to remain under contract.

*Following the injunction stage of these proceedings*, CSI submitted a set of Interrogatories to HCI to determine the exact nature of its purportedly remaining claims, the alleged damages related to these claims, and the nature of the proof which

---

[1] "Apparently" in agreement is hardly apt. Robert Mattlin, CSI's owner, devoted most of his summary judgment affidavit, namely paragraphs 14 to 41 and exhibits C through I, to making the indisputable case that HCI received "roughly equivalent to $3,000 per customer," which is the fair market value for a CSI dealer's Customer Base. CSI is more than "apparently" in agreement. Without any doubt, HCI received the same amount of sale proceeds for its Customer Base as any other CSI dealer would have received for its customers.

HCI believes would support any such claims.[2]  CSI has recently filed HCI's responses to these Interrogatories. (Doc. 157)

In the following Interrogatory answers, HCI delineated the two damages claims which it proposed as the claims surviving the temporary injunction proceedings:

> INTERROGATORY NO. 2: Do you contend that HCI has any remaining claims against Plaintiff which have not been dismissed by virtue of the Agreed Order Partially Dismissing As Settled entered on August 23,2006 (hereinafter "Agreed Order")?
>
> ANSWER: Yes. By its terms, the Agreed Order specifically reserves "the remaining claims of the parties under the December 31, 2004 Dealer Agreement. . ." Hemisphere Corporation retains its claims under its May 22,2006 Counterclaim for damages from ComputerEase's improper termination of the Dealer Agreement, *including losses from being required to sell its Customer Base at less than fair market value due to the timing and circumstances of the forced sale*, a sale entered into by Hemisphere Corporation only in an attempt to mitigate its damages.

With the filing of its Response Memorandum, HCI has now abandoned the forced sale contention in this answer, retaining only the mitigation of damages element.

> INTERROGATORY NO. 3: Please state in full the nature of each and every claim, if any, which HCI is asserting herein against Plaintiff which has not been dismissed by the Agreed Order.
>
> ANSWER: Every contract carries with it an implied covenant of good faith and fair dealing. Furthermore, the Dealer Agreement explicitly and implicitly affirms a dealer's ownership of the Customer Base which it develops in the course of its dealership activities, and Hemisphere Corporation is entitled to receive the difference between the forced sale value which it obtained from Microvisions II and the actual arms length, fair market value of that Customer Base, *plus the value of other revenue sources relating to Hemisphere Corporation's exclusive territory but which were not salable as Customer Base assets*.

---

[2] HCI claims that CSI's Dealer Agreement summary judgment motion attempts to rehash temporary injunction issues. (HCI Response Memo., p. 4)  To the contrary, CSI's motion is based on follow-up discovery aimed at eliciting from HCI what counterclaims it believes have survived the injunction process.  HCI identified two such claims, the forced sale claim and the exclusive territory claim.

This answer contains a huge admission that a dealer has two, and only two, sources of revenue, namely: (1) revenues from Customer Base assets; and (2) all other revenue sources relating to the dealer's exclusive territory. HCI obtained the former in the sale of its Customer Base to Microvisions II. It relinquished the latter in the parties' Limited Settlement Agreement ("*LSA*") and the Agreed Order. HCI affirmed these two sources of revenue in its response to Request for Admission No. 3 (Doc. 158):

> . . . Hemisphere Corporation is entitled to receive the difference between the forced sale value which it obtained from Microvisions II and the actual arms length fair market value of that Customer Base, plus the value of other revenue sources relating to Hemisphere Corporation's exclusive territory which were not salable as Customer Base assets.

As the Court is aware from CSI's main memorandum, these discovery responses by HCI provide the embarkation point for CSI's motion for summary judgment on the Dealer Agreement of December 31, 2004. The logic of CSI's position is straightforward: having no Customer Base (sold to Microvisions II for fair market value) and having no exclusive sales territory (relinquished in the LSA), HCI has no legal basis for projecting lost dealership revenues caused by CSI's alleged breach of contract. Despite the above discovery responses (never even mentioned in HCI's Response Memorandum), HCI complains that CSI is mischaracterizing its breach of contract claims. "The Court should not be mislead (sic) by Plaintiff's mischaracterization of Hemisphere's positions into replowing old ground."[3] (HCI Memo., p. 7)

CSI is not mischaracterizing Hemisphere's claim. It is quoting HCI's exact words

---

[3] There's not one word in CSI's memorandum regarding injunction issues. By contrast, a substantial part of HCI's memorandum is devoted to its one-sided rehash of its injunction arguments, such as the frivolous claim that CSI was needlessly interfering with HCI's sale of its Customer Base to Microvisions II. (HCI Response Memo., p. 6) Who is replowing old ground?

from its discovery responses. Likewise, in opposing the exclusive territory claim, CSI is relying upon the *exact verbiage of the LSA and of the Agreed Order*. The Agreed Order specifically states that certain identified claims are being dismissed with prejudice, including those "relating to the exclusive territory issues and continuing licensing interest of Hemisphere Corporation as a selling Dealer under the Dealer Agreement of December 31, 2004." Similarly, the LSA relinquished any existing right which HCI might claim to an "exclusive sales territory," (even though it had voluntarily allowed its dealer contract to expire without a new contract in place). The Agreed Order and LSA could not be more clear in this regard. Yet HCI's Response Memorandum contends that Hemisphere still has the right to contract damages without its Customer Base and without its exclusive sales territory. Moreover, neither HCI's discovery responses nor its Response Memorandum identifies any other source of contract damages.[4]

II.  HCI IS ATTEMPTING TO USE PAROL EVIDENCE TO CHANGE THE MEANING OF THE LIMITED SETTLEMENT AGREEMENT AND AGREED ORDER.

Hemisphere is adamant that it did not mean to do a global release. (HCI Response Memo., p. 12) It commences its argument by adverting to the integration clause at the end of the LSA, then citing <u>Fontback v. Compuserve</u>, 742 N.E.2d 674 (Ohio App. 2000) for the proposition that parol evidence cannot be used to "expand or change the meaning of an integrated contract." (HCI Response Memo., p. 7)

Amazingly, HCI then proceeds over the next four pages of its memorandum to

---

[4] HCI claims it is illogical for Plaintiff to contend that the agreed dismissal of its exclusive territory claim amounts to a dismissal of its entire Dealer Agreement damages claim. (HCI Response Memo., p. 6) To the contrary, what is illogical is HCI's discovery responses claiming that it still has an exclusive territory damages claim after it had expressly agreed that it was relinquished and dismissed with prejudice.

cite parol evidence to claim that the LSA does not mean what it says. (HCI Response Memo., pp. 8-11)  Specifically, HCI cites email communications and phone conversations as parol evidence which would supposedly undo the explicit language of both the LSA and the Agreed Order!  The Response Memorandum also chastises CSI and its legal counsel for changing positions in this litigation. (HCI Response Memo., p. 8)  Yet it is HCI which is attempting to recant its discovery responses (which it never mentions), as well as the terms of the LSA and Agreed Order.

As a matter of fact, CSI is not construing the LSA or the Agreed Order to be a global release having a "massive waiver effect," to use HCI's over the top verbiage. (HCI Response Memo., p. 13)  CSI has always understood that Hemisphere's intent was to reserve a particular damages claim.  Thus, until its recent Response Memorandum, HCI had always insisted that it received less than fair market value from the sale of its Customer Base to Microvisions II.  By the same token, CSI has always realized that this was a ridiculous claim.  Thus CSI knew there was a reason for the reservation of claims language in the LSA and the Agreed Order, but it also knew that HCI would never be able to prove its "forced sale" damages claim.

HCI refers to the reservation language in the LSA and Agreed Order as an "explicit reservation of claims" clause. (HCI Response Memo., pp. 2 & 14)  But of course there is nothing explicit about this very general reservation language.  That is why CSI had to propound Interrogatories to elicit from HCI the exact claim or claims which it was reserving.  One of HCI's responses, relating to the forced sale claim, CSI anticipated.  It did not anticipate that HCI would claim that the exclusive territory claim survived the LSA and Agreed Order.

III. COMPUTEREASE DID NOT FORCE HEMISPHERE TO GIVE UP ITS DEALERSHIP IN APRIL 2006, BUT RATHER HCI CHOSE TO DO SO MONTHS EARLIER.

In its discovery responses, quoted above, HCI based its exclusive territory claim (which it had previously relinquished and dismissed) on the Dealer Agreement of December 31, 2004. Likewise, in his affidavit, Lyon asserted that this 2005 Dealer Agreement governed its sale to Microvisions II: "It is this 2005 Dealer Agreement under which the sale of Hemisphere Corporation's Customer Base is being conducted. . ." (Lyon Affidavit, 7/27/06, Doc. 28, ¶6)

Lyon also acknowledged in his affidavit that following the expiration of the 2005 Dealer Agreement, HCI was acting in the capacity of a "transition dealer" pending the sale of its Customer Base. (Lyon Affidavit, 7/27/06, ¶16) Thus, as Lyon agrees, to retain the right to sell its Customer Base as per the terms of the dealer contract, a CSI dealer must continue its dealership duties through the date of sale. (Id.) CSI does not dispute Lyon's acknowledgment that he did maintain his dealership duties, despite the expiration of the 2005 Dealer Agreement, until he sold his Customer Base to Microvisions II.

Although HCI claims that CSI breached the terms of this agreement by improperly terminating it in April 2006, this is patently wrong as a matter of law. There is absolutely no way that this contract was still in effect in April 2006 and therefore absolutely no way that CSI forced Lyon to terminate his dealership contract. By its terms, the 2005 Dealer Agreement expired as of December 31, 2005. Also, it provided a 30-day grace period for continuing the dealership by executing the 2006 Dealer Agreement by January 30, 2006. *No one, absolutely no one, prevented Lyon from signing the 2006 dealer contract by January 30, 2006.* As a matter of

contract interpretation, there was no forced termination of Lyon's dealership.

In his supporting affidavits, Lyon provides absolutely no explanation for not signing the 2006 contract before the expiration of the 30-day grace period provided by the 2005 Dealer Agreement. *Nor does the HCI Response Memorandum.* Without question, if he had done so, there would be no contract basis to justify CSI's "terminating" his dealership. Stated otherwise, Scott Lyon voluntarily and without any compulsion by CSI or anyone else, allowed his dealership contract to expire as of January 30, 2006, triggering the 180-day period provided by the 2005 Dealer Agreement for selling his Customer Base prior to an auction by CSI.[5]

Three weeks after his dealer relationship with CSI expired, again without any explanation, on February 17, 2006, he attempted to post-date his signing of the 2006 Dealer Agreement to December 31, 2005. At that time, CSI exercised its business judgment not to resume the dealer relationship with HCI. HCI does not cite any legal basis whatsoever that would compel CSI to enter into a new dealer contract with Hemisphere. Lyon acted of his own free accord in failing to take advantage of the contractual 30-day grace period to continue his dealership.

Lyon is asking this Court to make up for his deliberate decision not to sign the new "fixed fee" dealer contract in the time required by the contract so that he can assert a damages claim - - as if he were still entitled to have an exclusive sales territory generating the same revenues as before his contract expired. In fact, this is the erroneous assumption underlying the damages report of Brad Townsend referenced in

---

[5] HCI claims that CSI filed its temporary injunction motion to force an auction of HCI's Customer Base. (HCI Response Memo., p. 6) The truth, which HCI seems to have an aversion to, is that CSI wanted detrimental provisions in HCI's purchase contract with Microvisions II to be deleted so that the sale could proceed without prejudice to CSI. CSI achieved this objective in the Agreed Order. (Doc. 29)

HCI's Response Memorandum. (HCI Response Memo., p. 15, n.3 & p. 18)  Townsend's report projects alleged future lost earnings as if HCI continued to have the same exclusive sales territory rights it relinquished in the LSA.  Without an exclusive territory, there is no uninterrupted revenue stream as Townsend projects.  Thus the Townsend projection is rendered useless and irrelevant by the LSA.

### IV. HEMISPHERE HAS ABANDONED ITS DAMAGES CLAIM RELATED TO THE SALE OF ITS CUSTOMER BASE TO MICROVISIONS II.

In paragraphs 15 through 41 of his affidavit, Robert Mattlin set out in minute detail the factual basis for disproving HCI's "forced sale" claim, as well as its claim that it did not receive fair market value in the "forced sale" to Microvisions II.  Faced with this onslaught of documented and indisputable facts, HCI has now conceded that it really does not have a forced sale claim and yes, it did receive fair market value from Microvisions II.

Saving face, HCI now describes the sale to Microvisions II as merely a "rational mitigation" rather than a forced sale causing damages. (HCI Response Memo., p. 18)  As stated above, HCI also now concedes that its receipt of $3,000 per customer amounts to "complete mitigation." (HCI Response Memo., pp. 15-16)  Comically, Hemisphere scoffs that CSI can't prove that HCI would have gotten more than $3,000 per customer if it had followed through in negotiations with other CSI dealers.  Okay.  CSI is just content to agree with HCI that it received fair market value for its Customer Base.

In fact, Lyon's affidavit of July 27, 2006, admitted that he got a fair price:

> The transaction between Hemisphere and Microvisions II was very carefully crafted *to reflect their Customer Base value* and incorporate terms of payment which are sustainable on an ongoing basis. (Emphasis added.)

(Lyon Affidavit, 7/27/06, Doc. 28, ¶17)  To the same effect, as explained in CSI's main

memorandum, the agreement with Microvisions II was also crafted to reduce HCI's tax liability by extending the earn-out over six years. Thus Lyon acknowledged that the purchase agreement "has been very carefully crafted to account for a number of operational, revenue and *tax issues*. . ." (Lyon Affidavit, 7/27/06, ¶27) Lyon reaffirmed this affidavit in his most recent affidavit. (Lyon Affidavit, 10/29/07, ¶2) It appears that Lyon knew all along, despite his discovery responses, that he got a fair deal with Microvisions II in a "carefully crafted" purchase agreement.

Thus, the one claim that was reserved (though not explicitly) in the LSA and the Agreed Order, namely the forced sale damages claim, has now been reconfigured as a mitigation of damages exercise by which HCI has gotten fair market value for its Customer Base by means of a carefully crafted purchase agreement.

V.  WHETHER OR NOT THE ROBERT MATTLIN AFFIDAVIT CAN PROPERLY SUPPORT CSI'S SUMMARY JUDGMENT MOTION ON THE DEALER AGREEMENT IS NOW A MOOT POINT.

CSI supported its motion for partial summary judgment on the Dealer Agreement with an affidavit from Robert D. Mattlin. In its Response Memorandum, HCI claims that paragraphs 13 and 21 set out impermissible legal arguments and therefore the affidavit should be struck. HCI is wrong. These paragraphs contain factual statements of CSI's positions in counterpoint to HCI's discovery responses referenced above, namely that HCI has a viable exclusive territory claim despite the LSA language and that the alleged "forced sale" to Microvisions II caused HCI to receive less than the going rate of $3,000 per customer. The paragraphs at issue in the Mattlin affidavit are no more legal arguments than HCI's answers to Interrogatories quoted above. Granted, they both state legal positions, but only as the respective position statements of the parties.

At any rate, the propriety of these paragraphs, and of the affidavit as a whole, is

now a moot point.  Most of the paragraphs (¶¶ 14 through 41) discuss the forced sale, insufficient sale price contention that HCI has now abandoned.  The first thirteen paragraphs present useful background information, but they are not in any way critical to the issue whether HCI has any viable damages claims which continue past the LSA and Agreed Order.

HCI contends that the parties' opposing affidavits present "wildly divergent" views of the material facts relating to HCI's improper termination claim. (HCI Response Memo., p. 5)  Though not pertinent to the current motion, this claim is "wildly" erroneous.[6]  Thus Lyon's affidavit claims that notice of the new fixed fee contract for 2006 should have been sent to him *by certified mail rather than by email*. (Lyon Affidavit, 06/30/06, Doc. 22, ¶6)  This is a legal issue of interpreting the 2005 Dealer Agreement, not a "wildly divergent" discrepancy in the facts.  The contract merely states that notice by certified mail is "deemed sufficient."  It does not say that email notice is insufficient.  Lyon does not dispute that he received the email nor that the email was timely.

There are no wildly divergent facts, just divergent legal interpretations of undisputed facts, relating to the expiration of the 2005 Dealer Agreement.  CSI is not asking the Court to determine if, under the language of the Dealer Agreement, the email notice was sufficient and timely.  Even if it was not, HCI has no improperly terminated claim for lost revenues.  It chose not to sign the new fixed fee contract by January 30, 2006.  It sold its Customer Base for fair market value, eliminating this potential

---

[6] Neither party has made a jury demand, though HCI argues that the wildly divergent facts must be decided by a jury. (HCI Response Memo., p. 17)  To the contrary, the pleadings from both sides recognize that the dispositive issues are matters of legal interpretation of the controlling documents.

damages claim. It relinquished its exclusive territory rights (assuming that it still had such rights after expiration of its final dealer contract), the only other source of dealer revenues.

## VI. CSI AGREES THAT THE LSA WAS NOT INTENDED AS A GLOBAL SETTLEMENT, BUT DISAGREES THERE WAS NO CONSIDERATION FOR HCI TO RELINQUISH ITS EXCLUSIVE TERRITORY CLAIM.

As stated above, CSI has always understood that HCI intended to reserve its claim, asserted under the 2005 Dealer Agreement, that the circumstances of the sale to Microvisions II resulted in HCI receiving less than fair market value for its Customer Base. CSI always disagreed with this claim, but knew that it was part of HCI's legal arsenal surviving the LSA and Agreed Order.

In fact, in a futile attempt to forestall a legal battle over the forced sale claim, CSI offered an olive branch. It offered HCI a chance to resume its dealership for as long as it needed (within 18 months) to sell its Customer Base without any alleged time pressure. We have now heard that Scott Lyon is too moral to have accepted CSI's offer. He asserts that he was legally and morally obligated to continue with a transaction into which he was forced by CSI against his will.[7] (Lyon Affidavit, 10/29/07, ¶5)

At any rate, once Lyon turned down CSI's offer of reinstatement, CSI was prepared to defend against an inevitable claim, knowing that it was not released by the subsequent LSA or Agreed Order. But now, having met with documented proof that it has no claim that Microvisions II underpaid it, HCI has abandoned one of the claims

---

[7] Yet by email on May 31, 2006, Lyon warned Barb Laws of Microvisions II that Hemisphere could be "restored to its status as a Dealer." *See* the Hemisphere documents in Exhibit D to the Mattlin affidavit. He also sent a notice to his customers that, despite the sale, they would be dealing with the same Hemisphere representatives because "Hemisphere Software has joined with Microvisions" and the "only noticeable change you will see is a change in the name to Microvisions II." (*Id.*) Lyon was fully prepared to undo the deal!

that it identified in its October 2006 discovery responses, quoted above, as surviving the LSA and Agreed Order.

As stated, HCI's discovery responses identified two sources of damages that supposedly survived the LSA, the forced sale and HCI's exclusive territory rights. That the former survived, CSI agrees. As for the latter, it is obvious that it did not. HCI asserts that it is illogical to argue that it would give up such a claim since it amounts to $1.5 million. (HCI Response Memo., pp. 6 & 13) What is *really illogical* is that HCI would submit discovery responses (Doc. 157) that directly contradict, word for word, the very claim relinquished in the LSA and dismissed with prejudice in the Agreed Order.

The exclusive territory issue originated in the language of the purchase agreement between HCI and Microvisions II. HCI put language into the agreement that it was retaining its exclusive territory rights. It was selling its customers to Microvisions II, not its exclusive sales territory. Moreover, the agreement stated that by approving Microvisions II as the Buyer, *CSI was approving the terms of the agreement*. That is why CSI objected to the transaction, not just to "needlessly interfere" with HCI selling its Customer Base as HCI portrays it. Thereafter, the agreement reached with Judge Beckwith's assistance provided that CSI would approve Microvisions II as the Buyer and HCI would under no circumstances attempt to enforce the terms of the purchase agreement with Microvisions II against CSI in any litigation. This is spelled out in the Agreed Order.

Also, CSI made it clear that under the new "fixed fee" arrangement with its dealers, Microvisions II would be paying CSI a fixed fee to obtain the exclusive territory rights previously held by HCI. For this to occur, CSI requested that Hemisphere drop any claim that it still held these rights despite the expiration of the 2005 Dealer

Agreement. HCI agreed to do so in exchange for concessions that would facilitate the HCI-Microvisions II transaction. Thus CSI agreed to provide HCI with ongoing access to CSI software during the six-year term of the earn-out. It agreed not to change the 50/50 split of maintenance revenue during those six years (the major source of the funds which HCI would receive from the earn-out). And CSI agreed to relinquish its right to audit HCI's records for underpayments. These CSI commitments, made in exchange for HCI giving up its exclusive territory claim (which was not valid anyway), appear in the LSA and the addendum to the Microvisions II dealer contract with CSI. They also appear in the email communications referenced in HCI's Response Memorandum, specifically the John Kirk/Russell Fericks email of July 28, 2006.

HCI also contends that giving up its $1.5 million income stream claim is disproportionate to anything it received in return from CSI. To the contrary, the exclusive territory claim, to the extent it has any validity whatsoever, can only lead to speculative damages.[8] In the circumstances, after selling its Customer Base to Microvisions II, HCI would be exercising its exclusive territory rights in a territory where it no longer had any existing customers. It would be starting from scratch in the same territory where Microvisions II had purchased, and was servicing, HCI's former 453 customers. In these circumstances, it is impossible to guess how many new customers and new sales HCI would generate. Such speculative damages would entitle CSI to summary judgment on the exclusive territory claim. *See* the Ohio tripartite test for lost profits, including the reasonable certainty, non-speculation requirement, in

---

[8] Not only does this claim lead inevitably to damages that are merely speculative, it has no substantive merit, just nuisance value. Since Lyon voluntarily chose to allow the 2005 Dealer Agreement to expire, HCI lost its exclusive territory rights with the expiration of the contract.

Donar v. Snapp, 649 N.E.2d 42, 44 (Ohio App. 1994).

Upon analysis, therefore, HCI was giving up its weak exclusive territory rights claim for concessions by CSI that would facilitate Microvisions II staying in business and prospering - - two essentials for HCI to receive the full proceeds from its six year earn-out contract with Microvisions II. The practical implication of voluntarily resolving this claim is stark - - if Microvisions II, for example, made a new sale in the territory at issue, the question would arise whether the sale belonged to HCI or Microvisions II. The answer to this question could not await years of litigation. It was in everyone's best interest for HCI to relinquish this nuisance value, speculative claim.

## CONCLUSION

Amidst all the name calling and vitriol of HCI's Response Memorandum, it stands out very clearly that HCI voluntarily chose the course of action which it now complains about. It did so repeatedly. As of December 31, 2005, the expiration date of the 2005 Dealer Agreement, Lyon voluntarily chose not to sign the new "fixed fee" contract, the 2006 Dealer Agreement. No explanation. He just chose not to sign it. A month later, as of January 30, 2006, when the 30-day grace period ended, he had still chosen not to sign the fixed fee contract. No explanation. Lyon just chose not to do so, even though this meant that the 2005 contract was officially over as was any contractual right which HCI had to its exclusive sales territory.

Over the next six months following the expiration of the 30-day grace period provided in the 2005 Dealer Agreement, Lyon made additional voluntary and unforced choices. On April 21, 2006, he filed a lawsuit against CSI in the federal District Court in Salt Lake City, Utah, abruptly ending the parties' settlement negotiations. He then chose to sell the HCI Customer Base rather than obtain a ruling that he had a

contractual right to continue as a CSI dealer. Lyon thereafter, with the advice of counsel, chose in the LSA to relinquish any right he had to an exclusive sales territory, even though he would later claim in discovery responses that this was one of his two sources of damages.

Why did he give up his exclusive territory claim? This was an easy decision. If he allowed the 2005 Dealer Agreement to expire, without a new contract in place, he had already given up his exclusive territory rights as of January 30, 2006. The 2005 contract had expired by its own terms and HCI knew that it could not unring the bell.

Also, as stated, so long as HCI continued the charade that it was the owner of exclusive territory rights, Microvisions II would remain in limbo on the extremely important issue of who receives the revenue form new sales in the territory in question. For the sake of his deal with Microvisions II, Lyon relinquished a doubtful (to say the least) claim. Yet when discovery forced HCI to articulate its Dealer Agreement claims, Lyon tried to resurrect the moribund exclusive territory claim which he previously had chosen to relinquish.

There are no disputed facts regarding the choices that Lyon made on behalf of HCI. Based on these choices, CSI is entitled to summary judgment on the HCI Dealer Agreement claims.

Respectfully submitted,

/s/ Richard G. Meyer
Richard G. Meyer
Angela M. Gates (#0077122)
Deters, Benzinger & LaVelle, P.S.C.
207 Thomas More Parkway
Crestview Hills, Kentucky 41017
(859) 341-1881
(859) 341-1469 fax

>rmeyer@dbllaw.com
*Counsel for Plaintiff,*
*ComputerEase Software, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing was delivered via CM/ECF on the 8th day of November, 2007 to Russell Fericks at Russell-Fericks@rbmm.com and John C. Scott at jscott@faulkner-tepe.com.

>/s/Richard G. Meyer

141870.1